# STATE OF MICHIGAN

# COURT OF APPEALS

---

PEOPLE OF THE STATE OF MICHIGAN,

       Plaintiff-Appellee,

v

MICHAEL ZARAN IKIEL GARRETT,

       Defendant-Appellant.

UNPUBLISHED
January 3, 2019

No. 338311
Macomb Circuit Court
LC No. 16-000810-FC

---

Before: MURRAY, C.J., and SHAPIRO and RIORDAN, JJ.

PER CURIAM.

Defendant appeals his jury convictions of carjacking, MCL 750.529a, armed robbery, MCL 750.529, and resisting and obstructing a police officer, MCL 750.81d(1). The trial court sentenced defendant as a fourth-offense habitual offender, MCL 769.12(1)(a), which required a 25-year mandatory minimum sentence for the carjacking and armed robbery convictions, to be served concurrently. Defendant was also sentenced to a concurrent term of 1 to 15 years' imprisonment for resisting and obstructing a police officer. We affirm defendant's convictions but remand to the trial court for a determination of when defendant received actual notice of the habitual offender enhancement.

## I. BACKGROUND

Complainant Vincenzo Recchia testified that on the day in question he drove his truck to "Macomb Orchard Trail." It is undisputed that defendant was at the trail at that time, having ridden his bicycle there. According to Recchia, after he exited his vehicle defendant approached him and asked for money. Recchia told defendant that he did not have any money and then defendant asked Recchia if he had "dope" or marijuana. Recchia went for a walk on the trail and defendant rejoined him shortly thereafter. Recchia decided to turn around because defendant continued to ask him for money. At one point, defendant told Recchia that he was an "undercover cop" and that he was going to frisk Recchia. Eventually, defendant "pulled a knife," which Recchia described as a "folding knife" with an unopened blade. Recchia then gave defendant his phone and keys; defendant returned to the parking lot, placed his bicycle in Recchia's truck, and drove away.

-1-

A woman[1] then arrived in the parking lot and, after Recchia informed her of the situation, offered to follow defendant in her vehicle. Recchia and the woman followed defendant down a dead-end street. At the woman's request, defendant returned Recchia's phone and keys to him. Defendant then took his bike from the truck and went onto the trail. Law enforcement responded to the scene and tracked defendant to a nearby residence; defendant fled from the police until he was eventually apprehended. Detective Eric Ehrler interviewed defendant after his arrest. Ehrler testified that defendant's "story" of what occurred "consistently changed." However, defendant ultimately admitted to taking Recchia's truck and then returning it to him, although defendant's version of events differed substantially from Recchia's. At Ehrler's suggestion, defendant wrote a letter to Recchia in which he apologized for "trick[ing]" him. The letter was read to the jury and admitted into evidence.

At trial, defendant testified to an entirely new account of what transpired on the day in question. According to defendant, someone named "A.J." obtained Recchia's phone and keys on the trail. A.J. then returned to the trail's parking lot and asked for defendant's bicycle. Defendant obliged, and A.J. placed the bicycle in Recchia's truck and drove away. Defendant then began walking on the trail and saw A.J. parked in the truck at the end of a dead-end street. Defendant implored A.J. to return Recchia's property and offered to do so for him. Defendant said that he wrote an apology letter to Recchia because he thought Recchia was someone he "gipped" on a different occasion.

## II. CHALLENGES TO CONVICTIONS

Defendant presents two claims of error that occurred during trial. Specifically, defendant argues that the trial court plainly erred in allowing introduction of his prior criminal convictions without considering their probative value and prejudicial effect as required by MRE 609. Defendant also contends that the prosecutor argued facts not in evidence and improperly bolstered detective Ehrler's testimony when he told the jury that the videotaped interview—which was not admitted into evidence—was consistent with Ehrler's testimony. Defendant also argues that he was denied effective assistance of counsel on these matters. We agree with defendant on all counts. However, considering the substantial evidence presented against defendant, and the lack of any credible defense, we conclude that these errors did not likely affect the outcome at trial and were therefore harmless.

Defendant did not preserve these issues by raising them before the trial court and therefore our review is for plain error affecting substantial rights. *People v Jackson*, 313 Mich App 409, 421; 884 NW2d 297 (2015). In order for a plain error to affect substantial rights, generally there must be a showing of prejudice, "i.e., that the error affected the outcome of the lower court proceedings." *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999). Similarly, reversal is not required for a harmless error. MCR 2.613; see also MCL 769.26. Generally, errors do not require reversal "unless, after an examination of the entire cause, it affirmatively appears that it is more probable than not that the error was outcome determinative."

---

[1] Law enforcement identified the woman as Rhonda Walters, who was not called as a witness. Law enforcement did not have her current contact information.

*People v Williams*, 483 Mich 226, 243; 769 NW2d 605 (2009). Because the trial court did not conduct an evidentiary hearing on defendant's claims of ineffective assistance of counsel, our review is limited to mistakes apparent on the record. *People v Lane*, 308 Mich App 38, 68; 862 NW2d 446 (2014).

## A.  MRE 609

Under MRE 609, evidence of a witness's prior crimes for the purposes of attacking credibility is generally inadmissible

> unless the evidence has been elicited from the witness or established by public record during cross-examination, and
>
> (1) the crime contained an element of dishonesty or false statement, or
>
> (2) the crime contained an element of theft, and
>
> > (A) the crime was punishable by imprisonment in excess of one year or death under the law under which the witness was convicted, and
> >
> > (B) the court determines that the evidence has significant probative value on the issue of credibility and, if the witness is the defendant in a criminal trial, the court further determines that the probative value of the evidence outweighs its prejudicial effect.  [MRE 609(a).]

Thus, MRE 609 requires the trial court to first

> determine whether the crime contains elements of dishonesty or false statement. If so, it would be admitted without further consideration.  If not, then the judge must determine whether the crime contains an element of theft.  If it is not a theft crime, then it is to be excluded from evidence without further consideration.  If it is a theft crime and it is punishable by more than one year's imprisonment, the trial judge would exercise his discretion in determining the admissibility of the evidence by examining the degree of probativeness and prejudice inherent in the admission of the prior conviction.  [*People v Allen*, 429 Mich 558, 605-606; 420 NW2d 499 (1988).]

To determine the probative value of the evidence, MRE 609 provides that

> the court shall consider only the age of the conviction and the degree to which a conviction of the crime is indicative of veracity.  If a determination of prejudicial effect is required, the court shall consider only the conviction's similarity to the charged offense and the possible effect on the decisional process if admitting the evidence causes the defendant to elect not to testify.  The court must articulate, on the record, the analysis of each factor.  [MRE 609(b).]

In this case, the trial court plainly erred by not determining whether defendant's prior crimes contained an element of dishonesty or theft and by not conducting an inquiry into the

probative value and prejudicial impact. After the close of proofs, defendant expressed his desire to testify. The prosecutor stated that he intended to introduce evidence of three of defendant's prior convictions: a 2007 second-degree home invasion conviction; a 2008 unarmed robbery conviction; and a 2008 attempted UDAA conviction. The trial court's only comment on the issue was that the prior convictions were admissible because the crimes were within MRE 609(c)'s 10-year time limit. However, MRE 609's plain language and Michigan Supreme Court precedent required the trial court to determine the nature of defendant's prior convictions and to weigh the probative value of any theft-related crime against its prejudicial effect. It appears that all three prior convictions contained an element of theft and therefore needed to be analyzed in accordance with MRE 609(a)(2)(B) and (b).[2]

For similar reasons, trial counsel committed professional error by failing to oppose the prosecution's introduction of defendant's prior convictions.[3] Defendant would have been no worse off had counsel failed to persuade the trial court to preclude the evidence, so this was not a strategic decision and there were meritorious arguments against introducing defendant's theft-related convictions. First, defendant's prior convictions were not significantly probative of his credibility. These were old convictions and theft crimes are generally considered to have minimal probative value on a witness's credibility. *People v Meshell*, 265 Mich App 616, 635; 696 NW2d 754 (2005). Second, under the language of MRE 609(b), the similarity of the prior offenses to the current offenses also weighed against their admission. Namely, defendant's prior convictions of unarmed robbery and UDAA were substantially similar to the current charges of armed robbery and carjacking. We also note that the trial court did not give the model jury instruction concerning impeachment by prior conviction, M Crim JI 5.1, or any other limiting instruction.

---

[2] Unarmed robbery contains an element of theft, but does not contain an element of dishonesty or false statement. *People v Johnson*, 206 Mich App 122, 125; 520 NW2d 672 (1994); MCL 750.30. The same is true for UDAA. *People v Hendricks*, 200 Mich App 68, 71; 503 NW2d 689 (1993), aff'd 446 Mich 435 (1994); MCL 750.413. Second-degree home invasion can, but does not necessarily, have an element of theft, and does not have an element of dishonesty or false statement. *People v Dunigan*, 299 Mich App 579, 582; 831 NW2d 243 (2013); MCL 750.110a(3). Defendant does not dispute the prosecutor's statement in closing argument that defendant broke "into someone's house to steal things."

[3] "To establish a claim of ineffective assistance of counsel, a defendant must show both that counsel's performance was deficient and that counsel's deficient performance prejudiced the defense." *People v Riley (After Remand)*, 468 Mich 135, 140; 659 NW2d 611 (2003). A defense counsel's performance was deficient if "it fell below an objective standard of reasonableness under prevailing professional norms." *Id*. To show prejudice, "the defendant must show the existence of a reasonable probability that, but for counsel's error, the result of the proceeding would have been different." *People v Carbin*, 463 Mich 590, 600; 623 NW2d 884 (2001). "There is a presumption that counsel was effective, and a defendant must overcome the strong presumption that counsel's challenged actions were sound trial strategy." *People v Cooper*, 309 Mich App 74, 80; 867 NW2d 452 (2015).

## B. PROSECUTORIAL MISCONDUCT

Allegations of prosecutorial misconduct are decided on a case-by-case basis, "with the reviewing court examining the pertinent portion of the record and evaluating the prosecutor's remarks in context." *People v Atkins*, 259 Mich App 545, 562; 675 NW2d 863 (2003). "The prosecutor may not make a statement of fact that is unsupported by the evidence. But the prosecutor may argue reasonable inferences arising from the evidence to the extent that the inferences relate to the prosecutor's theory of the case." *People v Lane*, 308 Mich App 38, 67; 862 NW2d 446 (2014) (footnotes omitted). Similarly, "[i]t is improper bolstering for a prosecutor to vouch for credibility of facts and evidence not in the case." *People v Stanaway*, 446 Mich 643, 686; 521 NW2d 557 (1994). "A prosecutor may not vouch for the credibility of his witnesses by suggesting that he has some special knowledge of the witnesses' truthfulness." *People v Seals*, 285 Mich App 1, 22; 776 NW2d 314 (2009).

Defendant's claim of prosecutorial misconduct concerns the prosecutor's decision not to play the videotaped police interview for the jury but to then assert in closing argument that the content of the video was "exactly" the same as detective Ehrler's testimony. The prosecutor's comment stemmed from Ehrler testifying that defendant admitted in the interview to threatening Recchia with a knife. At trial, defendant acknowledged both telling lies and making admissions in his interview with Ehrler. However, defendant denied telling Ehrler that he threatened Recchia with a knife and asked the prosecutor, "Where is the video at? When did I say that to him?" After defendant's testimony, the prosecutor moved the trial court to reopen proofs so that the videotaped interview could be admitted into evidence. The court denied the motion but told the prosecutor that he could explain to the jury his reasons for not playing the tape and inform them that either side could have played it. In closing arguments, the prosecutor stated in pertinent part:

> The video interview between Ehrler and the defendant was videotaped. In that videotape, or in that discussion, the defendant brings up—and I can't testify to the content of the tape because I can't testify, but I will say this: He brings up his past criminal acts. Well, I can't show that to you. I can't. I have to edit it. I have to do other things. So you make a choice, as a prosecutor, to put forth your evidence of the man who was there, Detective Ehrler. Detective Ehrler testified to the interview. He told you what took place in the interview. *Now, for you to have seen that, you would have seen exactly as Detective Ehrler presented it.* But given what's in there, you have to redact it, edit it, put that forth. So you don't ever really get the original video. [Emphasis added.]

By telling the jury that the videotaped interview was consistent with Ehrler's testimony, the prosecutor improperly argued facts not in evidence. The prosecutor also impermissibly bolstered Ehrler's credibility by strongly implying that he had special knowledge of Ehrler's credibility, i.e., the prosecutor had viewed the tape and found that Ehrler's testimony was accurate. Not all of the prosecutor's statements were improper. The prosecutor could argue that, based on the evidence, the jury should believe Ehrler rather than defendant. And the prosecutor could explain why he chose not to show the videotape. But by arguing that the recording of the interview was "exactly as Detective Ehrler presented it," the prosecutor made an assertion that

has no basis in the record.[4]  Under the circumstances, it was plainly erroneous for the trial court to not give the jury a curative instruction on this comment.

In addition, trial counsel's failure to object to the prosecutor's improper remark was not objectively reasonable.  On one hand, counsel may not have wanted to draw additional attention to the prosecutor's statement.  But the prosecutor's remark was plainly improper, and his prior statement that he "can't testify to the content of the tape" should have put counsel on notice.  Further, the prosecutor's comments went far beyond the court's direction that the prosecutor could inform the jury that either side could have introduced the tape and that he had reasons for not doing so.  Although trial counsel's actions are presumed to be sound trial strategy, "counsel's strategy must be sound, and the decisions as to it objectively reasonable." *People v Ackley*, 497 Mich 381, 388-389; 870 NW2d 858 (2015).  Counsel's failure to object to the prosecutor vouching for Ehrler's credibility and to request a curative instruction was not objectively reasonable.

## C.  HARMLESS ERRORS

In sum, the trial court plainly erred by failing to analyze defendant's prior convictions in accordance with MRE 609.  The court also plainly erred by not providing a curative instruction relating to the prosecutor's improper bolstering.  Defendant was also denied effective assistance of counsel on these matters.  That said, given the properly admitted evidence in this case, we cannot conclude that these errors, more likely than not, affected the outcome at trial.

In one sense, the case was a credibility contest between Recchia and defendant.  But Recchia's version of the events was supported by detective Ehrler's recitation of his interview with defendant.  Ehrler explained that defendant consistently changed his story before admitting to taking Recchia's vehicle.  Defendant's witness statement was admitted into evidence, in which he apologizes to Recchia for tricking him.  Defendant testified that he was apologizing for a different crime, as he thought that Recchia was a person that he "gipped" on a different occasion.  However, Ehrler was questioning defendant about the current offenses, and there is nothing in Ehrler's testimony to suggest that defendant would have written an apology letter about this earlier purported incident.

Defendant tried to his explain his prior admissions to Ehrler by testifying that he was telling Ehrler "stories."  But defendant's testimony at trial was in many respects internally inconsistent and at times incredible.  Defendant, contrary to all other evidence and the opening statements of counsel,[5]  maintained that someone else took Recchia's keys and phone and that he

---

[4] Contrary to the prosecution's assertion on appeal, defendant's apology letter to Recchia did not provide an evidentiary basis for this argument because the letter does not refer to defendant threatening Recchia with a knife or provide any indication of what defendant specifically told Ehrler about the offenses.

[5] In opening statements, trial counsel did not dispute that defendant took Recchia's truck but argued that he did not have the requisite intent to commit larceny.

merely returned those items to Recchia. For the first time, he identified "A.J." as being on the scene, though he could not provide any additional information about him beyond that A.J. lived in an apartment complex by the trail. Further, defendant initially identified A.J. as the perpetrator but later he was less sure, stating, "I think it was A.J."

Defendant's testimony also left several hanging questions. Why would the unidentified A.J.—who had just stolen or been given a vehicle and was in a rush—ask defendant for his bicycle? And why would defendant give his bicycle to A.J. when this was apparently defendant's sole mode of transportation? In short, even if the court had precluded introduction of defendant's prior convictions and given a curative instruction regarding the prosecutor's improper remark, there is not a reasonable probability that the jury would have found defendant more credible than the prosecution's witnesses, if at all. Accordingly, we conclude, after a review of the full record, that reversal is not required.

## III. DEFENDANT'S SENTENCING CHALLENGES

Defendant presents two challenges relating to his 25-year mandatory minimum sentence. Defendant first argues that the prosecution's failure to file a written proof of service of its notice to seek the habitual offender enhancement entitles him to resentencing without that enhancement. We conclude that if defendant received actual notice of the habitual offender enhancement within the 21-day period required by MCL 769.13, then the prosecution's failure to file proof of service was harmless. But if defendant did not receive actual notice within that period, then this error was not harmless and defendant is entitled to be resentenced without the habitual enhancement. Because the record does not reveal when defendant received actual notice, we remand to the trial court so that it may make a factual finding on this matter.

Alternatively, defendant argues that his sentence constitutes cruel or unusual punishment under the Michigan Constitution. However, considering that he committed three felonies in the incident giving rise to this case and had committed four prior felonies, defendant fails to establish that his sentence is grossly disproportional.[6]

## A. PROOF OF SERVICE

MCL 769.13 provides in relevant part:

(1) In a criminal action, the prosecuting attorney may seek to enhance the sentence of the defendant as provided under section 10, 11, or 12 of this chapter, by filing a written notice of his or her intent to do so within 21 days after the defendant's arraignment on the information charging the underlying offense or, if arraignment is waived, within 21 days after the filing of the information charging the underlying offense.

---

[6] We review these unpreserved issues for plain error affecting substantial rights. *Jackson*, 313 Mich App 409.

(2) A notice of intent to seek an enhanced sentence filed under subsection (1) shall list the prior conviction or convictions that will or may be relied upon for purposes of sentence enhancement. *The notice shall be filed with the court and served upon the defendant or his or her attorney within the time provided in subsection (1)*. The notice may be personally served upon the defendant or his or her attorney at the arraignment on the information charging the underlying offense, or may be served in the manner provided by law or court rule for service of written pleadings. *The prosecuting attorney shall file a written proof of service with the clerk of the court.* [Emphasis added.]

The word "shall" indicates "a mandatory directive." *People v Comer*, 500 Mich 278, 289 n 26; 901 NW2d 553 (2017). Thus, in addition to filing a notice of intent to enhance the defendant's sentence, the prosecution must also file proof that its notice was served on the defendant. MCL 769.13(2). Moreover, the defendant must be served within 21 days after the filing of the information if the arraignment was waived, *id.*, as was the case here.

In *People v Cobley*, 463 Mich 893 (2000), the Michigan Supreme Court vacated defendant's sentence as a fourth-offense habitual offender and ordered resentencing "because the prosecutor has not proven that the notice of sentence enhancement was served on defendant within 21 days after the defendant was arraigned." Thus, *Cobley* made clear that a prosecutor's failure to provide notice within the applicable 21-day time period precludes the prosecuting attorney from seeking a habitual offender enhancement. *Cobley*, a Supreme Court order, is binding precedent because it contains a recitation of the relevant facts and the reason for the Court's decision. *People v Crall*, 444 Mich 463, 464 n 8; 510 NW2d 182 (1993).

Defendant relies on *People v Straughter*, unpublished per curiam opinion of the Court of Appeals, issued April 11, 2017 (Docket No. 328956), in which a panel of this Court followed *Cobley* in remanding for resentencing without habitual enhancement due to the prosecutor's failure to file a written proof of service. The Supreme Court granted oral argument on the prosecution's application for leave in *Straughter* in part to consider whether a harmless-error analysis is applicable to MCL 769.13's notice requirements and whether the prosecutor may provide notice to a defendant other than by a proof of service. *People v Straughter*, 501 Mich 944 (2017).[7]

Since *Straughter* was decided, however, this Court in a published decision applied a harmless-error analysis to MCL 769.13(2)'s proof of service requirement. *People v Head*, 323 Mich App 526, 544-545; 917 NW2d 752 (2018). In *Head*, this Court held that the prosecutor's failure to file proof of service of the habitual-offender notice was harmless "because defendant had actual notice of the prosecutor's intent to seek an enhanced sentence and defendant was not prejudiced in his ability to respond to the habitual offender notification." *Id*. at 544. In concluding that the defendant received actual notice in that case, this Court noted that the defendant "received actual notice on the record at the preliminary examination that he was being charged as a fourth-offense habitual offender." *Id*. This Court also reasoned that "[t]here was no

---

[7] The Court was scheduled to hear oral argument in *Straughter* on October 9, 2018.

indication at the arraignment hearing that defendant or his attorney had not received a copy of the felony information," which in that case included the habitual offender notice. *Id*.

*Head* is binding precedent on this Court, MCR 7.215(J)(1), and *Straughter* is not, MCR 7.215(C)(1). Therefore, as it currently stands, a failure to file a proof of service is subject to a harmless-error test. However, *Head* does not state that actual notice given outside the applicable 21-day period is subject to harmless-error review. Significantly, the *Head* opinion indicates that the defendant received actual notice within that period because the record showed that he received notice at the preliminary examination and then received a copy of the habitual offender notice at the arraignment. More important, the *Head* panel did not distinguish *Cobley*, in which the Supreme Court remanded for resentencing when the prosecutor could not prove timely notice and did so without harmless-error review. We conclude that *Cobley* and *Head* are in harmony, i.e., a failure to file a proof of service within 21 days is subject to a harmless-error analysis when the defendant has received actual notice within that period, but that if the actual notice is not given within the 21-day statutory period, defendant may not be sentenced as a habitual offender.

In this case, it is unclear whether timely notice was provided. The prosecutor relies on the transcript from the scheduled circuit court arraignment, at which defendant was not present. The prosecutor asserts that at this hearing defense counsel acknowledged receiving the information and providing defendant a "copy of it." However, the transcript of that proceeding does not contain or reflect such an exchange. And here, unlike *Head*, the habitual offender notice was filed separately from the felony information. Thus, even if counsel received the felony information within the 21-day period, it remains unclear whether he also received the habitual offender information within that period. Notably, at a pretrial hearing about nine months later, defendant indicated that he only recently learned about the possibility of a 25-year mandatory minimum sentence. Thus, there is a question of fact on this record as to when defendant received actual notice in this case. Accordingly, we remand to the trial court to make a factual finding as to when defendant received notice. If the court finds that defendant did not receive actual notice within the 21-day time period, then he is entitled to resentencing without habitual offender enhancement. If defendant received actual notice within that period, the prosecutor's failure to file a written proof of service was harmless.

## B. CRUEL OR UNUSUAL PUNISHMENT

In the event that defendant is not entitled to resentencing, we conclude that his 25-year mandatory minimum sentence does not constitute cruel or unusual punishment. MCL 769.12(1)(a) provides:

> (1) If a person has been convicted of any combination of 3 or more felonies or attempts to commit felonies, whether the convictions occurred in this state or would have been for felonies or attempts to commit felonies in this state if obtained in this state, and that person commits a subsequent felony within this state, the person shall be punished upon conviction of the subsequent felony and sentencing under section 13 of this chapter as follows:

> (a) If the subsequent felony is a serious crime or a conspiracy to commit a serious crime, and 1 or more of the prior felony convictions are listed prior felonies, the court shall sentence the person to imprisonment for not less than 25

years. Not more than 1 conviction arising out of the same transaction shall be considered a prior felony conviction for the purposes of this subsection only.

The Michigan Constitution provides that "cruel or unusual punishment shall not be inflicted[.]" Const 1963, art 1 § 16.[8] This prohibition precludes "grossly disproportionate sentences." *People v Benton*, 294 Mich App 191, 204; 817 NW2d 599 (2011). "Legislatively mandated sentences are presumptively proportional and presumptively valid." *People v Brown*, 294 Mich App 377, 390; 811 NW2d 531 (2011). To determine if a sentence constitutes cruel or unusual punishment, "we consider the gravity of the offense and the harshness of the penalty, comparing the punishment to the penalty imposed for other crimes in this state, as well as the penalty imposed for the same crime in other states." *Id.*

A 25-year mandatory minimum sentence is a harsh penalty. However, the severity of the sentence should be considered in the context of defendant's sentencing guidelines. His minimum sentence guidelines range for carjacking was 171 to 570 months. Thus, the 25-year minimum sentence was well within the guidelines range, and "[a] sentence within the guidelines range is presumptively proportionate, and a proportionate sentence is not cruel or unusual." *People v Bowling*, 299 Mich App 552, 558; 830 NW2d 800 (2013). In that light, the mandatory minimum does not impose an unduly harsh sentence.

As for the gravity of the offense, defendant argues that he did not commit violence against Recchia. However, he was convicted of two "serious crimes" (carjacking and armed robbery) against Recchia for the purposes of the habitual offender statute. MCL 769.12(6)(c). Additionally, in considering the gravity of the offense, it is appropriate to consider defendant's criminal history. *Ewing v California*, 538 US 11, 29; 123 S Ct 1179; 155 L Ed 2d 108 (2003). Defendant had been convicted of numerous misdemeanors and four felonies, two of which (second-degree home invasion and unarmed robbery) are "listed prior felonies" under the habitual offender statute. MCL 769.12(6)(a)(*iii*). Moreover, defendant has consistently engaged in the same type of criminal behavior despite repeated convictions. Specifically, defendant was convicted on separate occasions of attempted receiving and concealing stolen property—motor vehicle, attempted UDAA, and unarmed robbery. Further, comparing defendant's 25-year minimum sentence to those that may be imposed for other Michigan crimes, Michigan has several crimes for which sentences of 25 years or more can be imposed even in the absence of recidivism, including carjacking and armed robbery. Under the circumstances, the length of defendant's sentence did not in and of itself demonstrate that it was cruel or unusual.

As for other state's penalties, defendant relies only on California's "three strikes law," which the United States Supreme Court upheld in a plurality decision against a cruel and unusual

---

[8] The Eighth Amendment to the federal constitution prohibits cruel *and* unusual punishment. US Const, Am VIII. "If a punishment passes muster under the state constitution, then it necessarily passes muster under the federal constitution." *People v Benton*, 294 Mich App 191, 204; 817 NW2d 599 (2011).

punishment challenge. *Ewing*, 538 US 11.[9]  Defendant argues that California's habitual offender statute (at least as it existed in 2003 when *Ewing* was decided) is less severe than Michigan's because it requires that one of the prior felonies be a violent or serious crime, that the prosecution must prove the prior convictions beyond a reasonable doubt, and because it allows trial courts to vacate allegations of prior serious or violent convictions.  See *id*. at 16-17.  The fact that California's law requires that at least one of the prior convictions be a violent crime does, to some degree, distinguish it from Michigan's fourth-offense habitual offender statute, which does not require the prior felonies to be serious crimes.  769.12(1)(a).  However, similar to California's law, Michigan's statute is triggered only by the commission of a new serious crime. *Id*.  And, while California's law is more flexible than Michigan's, defendant does not refer to any other state's laws and therefore fails to demonstrate that Michigan's approach is unique or unusual.

In sum, defendant has not demonstrated that application of MCL 769.12(1)(a) in this case constituted cruel or unusual punishment.  The 25-year minimum sentence could have been imposed even absent the habitual offender statute, as a sentence of such length is permitted for various crimes in Michigan and fell within defendant's guidelines range.  Defendant has not provided sufficient information regarding other state's similar laws to conclude that Michigan's statutory scheme is cruel or unusual particularly where, as here, defendant has a total of seven felony convictions.

## IV.  STANDARD 4 BRIEF

In his Standard 4 brief, defendant first argues that he was a victim of an unreasonable search and seizure.[10]  The United States and the Michigan Constitutions grant individuals the right to be secure against unreasonable searches and seizures.  US Const, Am IV; Const 1963, art 1, § 11.  "Generally, a search conducted without a warrant is unreasonable unless there exist both probable cause and a circumstance establishing an exception to the warrant requirement." *People v Mayes*, 202 Mich App 181, 184; 508 NW2d 161 (1993).  Under the "hot pursuit" exception to the warrant requirement, "an officer may chase a suspect into a private home when the criminal has fled from a public place." *People v Henry (After Remand)*, 305 Mich App 127, 138; 854 NW2d 114 (2014) (quotation marks and citation omitted).

The record establishes that law enforcement responding to a call of armed robbery and carjacking tracked defendant to the home of Christina Suggs.  Deputy Dan Degraw testified at the preliminary examination that he found a bicycle on the trail matching the description of the suspect's bicycle.  Degraw's canine then identified an odor from a footprint and tracked it to the

---

[9] Writing for the Court, Justice O'Connor first determined that the Court would not interfere with California's policy decision to address recidivism, which had a legitimate basis. *Ewing*, 538 US at 24-28.  Justice O'Connor then examined the defendant's offense and criminal history before concluding that his sentence did not constitute cruel and unusual punishment. *Id*.  at 28-30.

[10] All of the issues defendant raises in his Standard 4 brief are unpreserved and therefore our review is for plain error affecting substantial rights. *Jackson*, 313 Mich App 409.

backyard of Suggs's property. Officers then spoke to Suggs, who told officers something to the effect of: "I know who you're looking for, he's in the house." Eventually, officers entered the home without Suggs's consent and found defendant, who then fled from the home.

Based on the record before us, we conclude that the officers were justified to enter Suggs's property and home without a warrant under the hot-pursuit exception. Defendant fled from a public place, i.e., the bike trail. Degraw's testimony indicates that the footprints he found were relatively close to defendant's bicycle. The canine tracked the scent obtained from a footprint to Suggs's backyard. Suggs spoke with the officers and confirmed that the person they were looking for was in the home. While it does not appear that the officers and Suggs ever definitively established that they were referring to the same person, under the circumstances, Suggs's confirmation, along with the canine tracking the suspect to that residence, gave the officers probable cause to believe that defendant was in the home and therefore they could properly enter the home without a warrant pursuant to the hot-pursuit exception.

Next, defendant argues that the statements he made to detective Ehrler were not voluntary and that his trial counsel should have requested a *Walker*[11] hearing. "Statements made by a defendant during a custodial interrogation are inadmissible unless the defendant voluntarily, knowingly, and intelligently waived his or her right against self-incrimination." *People v Roberts*, 292 Mich App 492, 505; 808 NW2d 290 (2011). "Voluntariness is determined by examining the totality of the circumstances surrounding a statement to establish if it was the product of an essentially free and unconstrained decision by its maker." *Id*.

To begin, defendant concedes that he was given *Miranda*[12] warnings before the interview. "[C]ases in which a defendant can make a colorable argument that a self-incriminating statement was 'compelled' despite the fact that law enforcement authorities adhered to the dictates of *Miranda* are rare." *Berkemer v McCarty*, 468 US 420, 433 n 20; 104 S Ct 3138; 82 L Ed 2d 317 (1984). Defendant claims that he was withdrawing from several drugs at the time of the interview and that he advised detective Ehrler of this fact. However, Ehrler testified that he observed defendant to make sure that he was not intoxicated or impaired before conducting the interview. Notably, defendant does not dispute Ehrler's conclusion that defendant was able to make an informed decision to waive his Fifth Amendment right against self-incrimination. Defendant also argues that detective Ehrler provided him false information during the course of the interview. "The fact that police lie to a suspect about the evidence against him does not automatically render an otherwise voluntary statement involuntary." *People v Perkins*, 314 Mich App 140, 155; 885 NW2d 900 (2016), opinion vacated in part by *People v Perkins*, unpublished order of the Court of Appeals, entered February 12, 2016 (Docket Nos. 323454, 323876, 325741), and superseded in part on other grounds by *People v Hyatt*, 316 Mich App 368; 891 NW2d 549 (2016). As noted, the videotaped interview was not admitted into evidence. Moreover, Ehrler was not questioned about these purported statements. Because our review is limited to the record, *People v Powell*, 235 Mich App 557, 561 n 4; 599 NW2d 499

---

[11] *People v Walker (On Rehearing)*, 374 Mich 331; 132 NW2d 87 (1965).

[12] *Miranda v Arizona*, 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

-12-

(1999), we decline to address whether the alleged misrepresentations rendered defendant's statements to Ehrler involuntary.

Further, we cannot conclude that the defense counsel was ineffective for failing to move for suppression of the statements. The record reveals that counsel was at one point contemplating requesting a *Walker* hearing but no such request was ever made. Presumably, counsel reviewed the videotaped interview and concluded that a motion to suppress would not be successful. Counsel was not required to make futile arguments. *People v Ericksen*, 288 Mich App 192, 201; 793 NW2d 120 (2010). In any event, the record does not establish that counsel's decision not to request a *Walker* hearing was objectively unreasonable.

Finally, defendant argues that his lack of representation at the district court arraignment denied him his constitutional right to counsel. The Sixth Amendment to the United States Constitution provides that criminal defendants have the right to counsel. US Const, Am VI. However, it is established that "the federal constitution does not require the appointment of counsel at arraignment." *Oakland Co v Michigan*, ___ Mich App ___, ___; ___ NW2d ___ (2018) (Docket No. 341172); slip op at 10 (emphasis removed). Accordingly, this argument is without merit.[13]

We affirm defendant's convictions but remand to the trial court for proceedings consistent with this opinion. We do not retain jurisdiction.

/s/ Christopher M. Murray
/s/ Douglas B. Shapiro
/s/ Michael J. Riordan

---

[13] We have reviewed the remainder of defendant's arguments in his Standard 4 brief and conclude that they lack merit and do not warrant discussion.